Roy CARVER, Lucille Carver and Carver Pump Company, a Delaware corporation, Appellants,

v.

Robert E. TANNER, Appellee.

No. 15860.

United States Court of Appeals Eighth Circuit.

Jan. 30, 1958.

Margaret Stevenson, Davenport, Iowa (Carl H. Lambach, Davenport, Iowa, Charles P. Hanley, Muscatine, Iowa, and Kenneth B. Holm, Omaha, Neb., were with her on the brief), for appellants.

Larned A. Waterman, Davenport, Iowa (Harvey G. Allbee, Muscatine, Iowa, Lane & Waterman, Davenport, Iowa, and Allbee & Allbee, Muscatine, Iowa, were on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and VOGEL, Circuit Judges.

WOODROUGH, Circuit Judge.

 Robert Tanner brought this action against Roy Carver, Lucille Carver and their wholly owned Carver Pump Company, a Delaware Corporation engaged in the manufacture of pumps at Muscatine, Iowa, to recover $18,000.00 claimed to be due him under the terms of a five-year employment contract he had with them, of date, August 28, 1953. The employment contract provided that the Company employed him for five years as its General Manager, but could terminate his employment at any time upon making certain payments to him, and particularly, if the termination occurred after September 1, 1954, but prior to September 1, 1955, he should be paid nine months salary at $2,000.00 per month. He alleged that his employment was summarily terminated while he was in the proper performance of his duties during the period between said dates, to-wit: on July 6, 1955, and that the amount sued for then became due him under the contract and payment had been refused.

Defendants admitted the employment contract and the severance pay provision thereof and that the employment was terminated within the five year period, but denied breaching the contract and plead affirmatively that the contract became abrogated or terminated on January 14, 1955, when defendants and the United States District Director of Internal Revenue for Iowa, following the issuance of distraint warrant against defendants for delinquent taxes, entered into a certain Escrow Agreement, by which the supervision and control of the finances and operation of the Company's plant were vested in an Escrow Agent. The plaintiff was named as the Escrow Agent and signed the agreement as Escrow Agent.

Defendants alleged that the terms of the Escrow Agreement conflicted with and were inconsistent with the employment contract so that the employment contract became terminated, without any severance pay due the plaintiff, upon the execution of the agreement. The controversy was whether plaintiff's employment was terminated at that time or on July 6, 1955. On the latter date the Escrow Agreement had been terminated by the Director and the taxpayers and Mr. Carver resumed control of the Company and ousted plaintiff from the Company premises, asserting that he had no contract.

On the jury trial of the case, defendants moved for directed verdict at the close of all the evidence asserting that the evidence showed that the employment contract sued on had been superseded by the Escrow Agreement which terminated it.

The court overruled the motion and submitted to the jury the question whether the employment contract had been abrogated or terminated on January 14, 1955, as claimed by defendants, or terminated by defendants on July 6, 1955, as claimed by plaintiff. The jury verdict was for the plaintiff against all defendants. Plaintiff had judgment thereon against all defendants for $18,000.00, interest and costs. Defendants' timely motion for judgment notwithstanding the verdict or for new trial was denied. The defendants appeal.

I

They contend for reversal that the court erred in denying their motion for directed verdict made at the conclusion

of all the evidence and their timely motion for judgment notwithstanding the verdict or in the alternative for new trial, because, as they claim, it was the inevitable effect of the Escrow Agreement to render the employment impossible of performance and the court should have determined from the text of the two contracts that it was the intention of the parties to abrogate the employment contract on January 14, 1955.

It appears from the pleadings, pretrial and discovery proceedings and the evidence at the trial that defendants Roy Carver and his wife Lucille Carver had been associated in business at Muscatine, Iowa, manufacturing pumps and that the defendant, Carver Pump Company, succeeded to the business, Roy Carver owning fifty-one per cent and his wife, forty-nine per cent of the capital stock. All defendants had become indebted on account of unpaid Federal taxes assessed against them prior to August 28, 1955, the date on which the employment contract with the plaintiff was entered into. That contract provided that the Company would employ plaintiff for a period of five years as its General Manager at a salary of $2,000.00 per month (after he took up residence in Muscatine) so long as he continued to be employed by the Company. It also accorded plaintiff an option to buy stock in the Company and made detailed provision to preserve the relation of the stock to be sold him to the assets of the Company and the rights and privileges of other stockholders. The contract was executed in the name of the "Carver Pump Company, by R. J. Carver, President" and was signed by defendants, Roy Carver, Lucille Carver and by plaintiff, Robert Tanner.

The only obligations set forth in the contract which the plaintiff specifically undertook to perform were that he would "accept the offices of Director, and Vice President and employment as General Manager for the term * * * stated and during such term will promote and manage the Company's business and will exclusively devote his full time and best efforts and abilities thereto."

After the plaintiff had served under the contract one year and four and one-half months and it still had three years, seven and one-half months to run and on January 14, 1955, the Escrow Agreement was entered into, and upon which the defendants rely to defeat the plaintiff's recovery. It followed upon long negotiation with the District Director of Internal Revenue for Iowa, concerning unpaid taxes assessed against all the defendants. The Director had caused warrant of distraint to be issued to enforce collection of the taxes and the agreement was entered into as declared in a "Whereas" recital "in order to avoid the immediate necessity for seizure and sale of the business assets of the corporation" and because it was "in the best interests of the Government and of the Taxpayers that the business of the corporation be continued." The agreement called for a mortgage to be given to the Government on the Company real and personal property other than inventory and the right and power to supervise and control the finances and operation of the Company was vested in the Escrow Agent.

Defendant Roy Carver, the president of the Company, was to be retained and employed by the Escrow Agent to "assist and advise" at a salary of $2,000.00 per month. The Escrow Agent was to receive $2,000.00 a month out of the Company funds and was given the right to resign by giving 30 days written notice. The approval of the Director was required to incur expense out of the ordinary course of the business. Certain installments were to be paid on the taxes and also a proportion of the net profits. The agreement was terminable by consent of the Director and Taxpayers; or upon seizure by the Director; or by the Company's refusal to extend the period of the statute of limitations on request of the Director; or by payment of the taxes; or by resignation of the Escrow Agent.

In general the writing conformed to the conventional definition of an Escrow in that by the terms of it the defendants put the corporate assets under the control

of a third person in certain respects to be returned to them upon the performance of conditions but without any change of title. The Company remained the owner of its property. The plaintiff had no part in the negotiation of the Escrow Agreement. He was chosen to act as Escrow Agent on the recommendation of the taxpayers' attorney, who drafted the Escrow Agreement for "the purpose of eliminating the chance that someone else might be put into the position, necessitating payment of two salaries; one to the General Manager of the Company and one to the Escrow Agent." Defendant Roy Carver was in complete accord with the arrangement by which the Company's General Manager was selected.

After the execution of the Escrow Agreement plaintiff remained General Manager, Vice President and Director of the Company and performed his work for the Company as he had been doing for the preceding sixteen months, since August 28, 1953.

There was no change of duties on his part nor in the salary of $2,000.00 per month he received from the Company. He was not entitled to receive any compensation for the additional duties the Escrow imposed upon him. The Escrow Agreement was in existence a little less than six months.

Plaintiff worked in harmony with defendant Roy Carver for several months after the the execution of the Escrow Agreement. Thereafter, however, some disputes arose between them as to different proposals for the business. There was testimony that on one occasion plaintiff told certain employees not to accept orders from defendant Carver since "he [plaintiff] was supposed to be running the Company and could not do so with any degree of regularity and planning when [Mr. Carver] gave contrary orders."

The court instructed the jury that "the defendants take the position that although it was not expressly stated in the Escrow Agreement, it was the intention of the parties in executing the Escrow Agreement on January 15, 1955, to there-

by terminate the five year employment contract which had been entered into in August of 1953. * * * The essential issue for your decision is as to whether or not the five year employment contract was terminated by the mutual intention of the parties on January 14, 1955, * * If you find it was the intention of the parties by the execution of the Escrow Agreement to terminate the five year employment contract, then there was no breach of that contract later on July 6, 1955, and the plaintiff is not entitled to recover."

In the opinion and order accompanying denial of the motion notwithstanding the verdict, the court said:

"* * * at the very least a latent ambiguity was created by the two separate instruments which justified the submission to the jury of the extent to which the Escrow Agreement superceded or abrogated the entire Employment Contract or even its severance pay provision. For instance the Escrow Agreement did not by its express terms nor by necessary implication terminate the earlier employment contract. Had the parties intended a complete supersedure it would have been a simple matter to so state in the Escrow Agreement. More over the plaintiff's status under his employment contract, as Vice President, General Manager and Director of the corporate defendant, continued into the escrow period until his discharge on July 6, 1955. Additionally, the two agreements were of different duration and scope and served different purposes. The ambiguity was properly resolved by the jury."

On this appeal the appellants make comparisons, paragraph by paragraph, between the employment contract and the Escrow Agreement and elaborate the contention that plaintiff's obligations under the Escrow Agreement were in conflict with and incompatible with his obligations under his employment contract; that the contracts could not subsist together; and that the employment con-

tract was superseded by the later contract. We append the substance of both contracts,[1] omitting the details as to the option to purchase stock given in the employment contract. The comparisons and consideration of the extraneous evidence that was received without objection have not persuaded that the court erred in overruling defendants' motions. It appears that plaintiff was employed in the first place in full view of the liens of unpaid tax assessments then outstanding against the employers in favor of the Government and as General Manager of the Company he was never free to act in disregard of the Government's rights. The Escrow Agreement was entered into to preserve the status quo of ownership by the employers and to strengthen the lien of the Government and it accomplished those purposes. The plaintiff undertook some duties additional to his employment and acted as Escrow Agent at the instance of defendants without extra pay, but there was in fact no change of duties on his part. Defendants' claim of conflicts of the contracts rest on assumptions of conflicts of interest between the taxpayers and the Government. But there were none so far as the General Manager of the Company was concerned. He was obligated to "exclusively devote his full time and best efforts and abilities to promote and manage the Company's business". The Company and the Government had the same common interest in having him fulfill that obligation. The first and fundamental provision of the Escrow Agreement was that, except as therein provided, the business of the Company should be carried on and continued as in the usual course of business. That plainly meant that plaintiff should carry on as before as its General Manager, which he did without encountering any conflict with his duty as Escrow Agent.

The obligation of an Escrow Agent is by definition to exercise no discretion between the obligors and obligees in the escrow, but to follow strictly the terms of the agreement as it concerns them. No suggestion was ever made to plaintiff, when he undertook to act as Escrow Agent, that it would impair his employment contract and the district court was not required to conclude as a matter of law that it did.

The court received the evidence extraneous to the contracts tending to throw light on the intention of the parties in respect to their adhering to or receding from the employment contract by entering into the Escrow Agreement. That agreement was a temporary expedient to avoid immediate necessity for seizure and as pointed out by the court, it did not contain express provisions defining the intentions of the parties in the situation that arose, or its termination by agreement between the taxpayers and the Director. We conclude that there was no prejudicial error to the defendants in submitting the issue to the jury. The appellants took no exception to the instructions by which the court submitted it to the jury and there is no injustice in the verdict.

II.

Appellants also contend that the court erred in failing to instruct the jury in respect to their claims, pleaded in their answer, that plaintiff was guilty of breaches of his employment duties and was discharged for justifiable causes. The record in respect to this contention shows that the accusations against the plaintiff were general charges of "inability, incompetence and disloyalty". Plaintiff, in discovery proceedings, sought to learn the "specific conduct, act, omission or breach of condition" relied upon by appellants as grounds for discharge for cause. Appellants' answer to these interrogatories stated in general terms that "plaintiff's management of the enterprise was accompanied by continued loss for the period subsequent to his original employment, to-wit; August, 1953, down to and including January 14, 1955, * * * which [they] attributed to plaintiff's neglect, inefficiency and

1. See 252 F.2d 32.

lack of skill". No charge of disloyalty was included among the general charges of incompetency and the trial court, in its memorandum and order, stated:

"Rule 33 [Federal Rules of Civil Procedure, 28 U.S.C.A.] expressly provides that answers to interrogatories may be used to the same extent as provided in Rule 26(d) for the use of the deposition of a party. Rule 26(d)(2) provides that answers made by an individual party or an officer or director of a corporation which is a party may be used by an adverse party for any purpose. One purpose of Rule 33 is to narrow the issues and to enable the interrogating party to ascertain precisely what he will have to meet at the trial. Moore's Federal Practice, 2nd Ed., Sec. 33.02, page 2259. The court is of the opinion that the defendants waived disloyalty as a cause for discharge by failing to mention it in their interrogatory answers. During the course of the trial, the defendants withdrew all issues as to discharge for cause prior to January 14, 1955, and withdrew entirely the issue of incompetency. The only ground for discharge which they urge upon the jury was disloyalty, but this they had waived or were estopped to assert. There was no cause for discharge issue to submit to the jury."

The court instructed the jury that "you are not to consider any issue as to discharge of the plaintiff for inability, for incompetence or for disloyalty. Those issues have been withdrawn from the case." The appellants took no exception to that instruction and they are in no position to have a review of it here. Rule 51, Federal Rules of Civil Procedure, 28 U.S.C.A., Chicago Great Western Ry. Co. v. Casura, 8 Cir., 234 F.2d 441, 445; Mill Owners Mut. Fire Ins. Co. v. Kelly, 8 Cir., 141 F.2d 763, 765. They could not acquiesce in the court's declaration and then ask this court to dispute it. They argue that they had requested an instruction on the issue and that the court's refusal of the request was reversible error. Their request was denied however and appellants made no objection. We have concluded in any event that there was no substantial evidence to support a charge of just cause for discharge.

### III.

Appellants Roy Carver and Lucille Carver contend that they should not have been held individually liable to the plaintiff on the judgment. They strongly urge that the contract reads that the Company employs plaintiff and the Company agrees to pay the severance amounts, but the contract contains the following:

"Now, Therefore, for and in consideration of the premises and of the mutual covenants and agreements of the parties hereto, which, in the case of the Principal Stockholders, are intended to impose joint and several obligations and to grant joint and several benefits, it is mutually covenanted and agreed as follows:"

Roy and Lucille Carver signed the contract. Dealing with a wholly owned corporation the plaintiff undoubtedly wanted the owners obligated on the contract and on the trial of the case no point was raised that the liability of all defendants was not joint and several. No exception was taken to the form of verdict submitted to the jury. It included all defendants in a verdict if it was for plaintiff and as the trial court observed, "No instruction on this point was requested by the defendants nor did they ask the court to submit to the jury either a special verdict or written interrogatories; but the court, in any event, is of the opinion that under the employment contract the individual defendants were jointly and severally liable with the corporate defendant for the severance pay owing to the plaintiff."

We are not convinced that the judgment against the individual defendants is so clearly erroneous or unjust as to justify this Court in reversing on this point.

Finding no error in the proceedings or judgment, the judgment is affirmed.

Affirmed.

### Appendix

The Employment Contract, in pertinent part, is as follows:

"Agreement

"This Agreement made this . . . . day of August, 1953, by and between Carver Pump Company, a Delaware corporation, herein called 'the Company,' Roy Carver and Lucille Carver, his wife, herein called 'the Principal Stockholders,' and Robert Tanner, herein Called 'Tanner,' Witnesseth: that

"Whereas, the Company and the Principal Stockholders are desirous that Tanner should accept employment by the Company as Vice President and General Manager of the Company and Tanner is desirous of accepting such employment, all on the terms and conditions herein stated: and

"Whereas, the Principal Stockholders are the owners of 1,000 shares of the common stock of the Company, which is all of the capital stock of the Company now issued and outstanding; and

"Whereas, in connection with his employment by the Company, Tanner is desirous of presently acquiring four shares of its capital stock and the right to acquire during the term of his employment an additional 246 shares;

"Now, Therefore, for and in consideration of the premises and of the mutual covenants and agreements of the parties hereto, which, in the case of the Principal Stockholders are intended to impose joint and several obligations and to grant joint and several benefits, it is mutually covenanted and agreed as follows:

"1. Commencing on September 1, 1953, the Company will employ Tanner for a period of five years as its General Manager, provided, however, that the Company may terminate such employment at any time upon making payment to Tanner below provided:

"If termination occurs prior to September 1, 1954, six months' salary; if after September 1, 1954, but prior to September 1, 1955, nine months' salary; if after September 1, 1955, 12 months' salary.

"2. The Principal Stockholders will cause Tanner to be elected a Director and Vice President of the Company, it being understood that Tanner is to remain in such offices so long as he continues in the employment of the Company and that upon termination of such employment, he will relinquish such offices.

"3. Tanner will accept such offices and such employment as General Manager for the term above stated and during such term will promote and manage the Company's business and will exclusively devote his full time and best efforts and abilities thereto.

"4. Upon commencement of Tanner's employment, the Principal Stockholders will sell to Tanner and Tanner will buy from the Principal Stockholders four shares of the capital stock of the Company at a price equivalent to the fair market value of said shares on September 1, 1953, determined as hereinafter provided.

"5. Not later than June 1, 1954, Tanner will take up residence in, or in the environs of, Muscatine, Iowa, and will there maintain his principal residence during the period of his employment. The Company will reimburse Tanner for the expense of moving his family and household goods from his present address in Winnetka, Illinois, to Muscatine. The Company will also reimburse Tanner for all reasonable and necessary expenses incurred by him and about the Company's business and, until he takes up residence in Muscatine, for weekly travel expense between Winnetka and Muscatine and

for living and other expenses incident to temporary residence in Muscatine.

"6. For his services as General Manager, Vice President and Director, the Company will pay Tanner a salary of $1,666.67 per month until he shall take up residence in Muscatine and thereafter $2,000.00 per month so long as he shall continue to be employed by the Company.

"7. As a further consideration for his accepting employment and the offices as above provided. Tanner is hereby granted an option, at any time during his employment and for a period of three months after termination thereof for whatever reason, to subscribe for and to purchase from the Company 246 shares of its common capital stock at the option price hereinafter specified.
\* \* \*.

\* \* \* \* \* \*
 "Carver Pump Company
 "By R. J. Carver, President
"Attest:
 "Lucille Carver
 "Secretary.
 "R. J. Carver (Seal)
 "Roy Carver
 "Lucille Carver (Seal)
 "Lucille Carver
 "Robert E. Tanner (Seal)
 "Robert E. Tanner"

The Escrow Agreement was as follows:
 "Agreement

"This Agreement made and dated this 14th day of January, 1955, by and between Frank M. Halpin, District Director of Internal Revenue for the District of Iowa and R. E. Tanner of Muscatine, Iowa, hereinafter referred to as the 'Escrow Agent' and Roy J. Carver and Lucille A. Carver both individually, hereinafter sometimes referred to as the 'Carvers' and Carver Pump Company, a Corporation, hereinafter sometimes referred to as the 'Corporation,' all of Muscatine, Iowa, the Carvers and the Corporation being sometimes hereinafter referred to as the 'Taxpayers.'

 "Witnesseth That:

"Whereas, the Corporation is engaged in the manufacturing business in Muscatine, Iowa, and

"Whereas, the District Director has issued warrants for distraint against the Carvers and the Corporation, as a result of assessments in respect to certain Federal taxes, together with penalty and interest thereon, set out in a schedule attached hereto and marked Exhibit A.

"Whereas, the Taxpayers desire, and the District Director is willing, to make such arrangements as are necessary and proper in order to avoid the immediate necessity for seizure and sale of the business assets of the Corporation under and pursuant to said warrants for distraint; and

"Whereas, it is in the best interests of the Government and of the Taxpayers that the business of the Corporation be continued so as to preserve assets which will be available to satisfy the tax liability.

"Now, Therefore, for and in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereto hereby agree as follows:

"1. Except as hereinafter provided, the business of the Corporation will be carried on and continued as in the usual course of business.

"2. The Escrow Agent shall have the right and is hereby vested with such right and power, either in person or by representatives, to supervise and control the business finances and operation of the Corporation. The District Director shall have access to the Corporation's books, documents, premises and plants, and shall have the right from time to time as the District Director shall deem proper or necessary, to ex-

amine said books, documents, premises, factories and plants and to have from the Corporation and its said books, documents, premises, factories and plants, full and complete information as to the business of the Corporation and its financial condition. During this period the District Director will be furnished authenticated statements of the operations of the Corporation, including balance sheets and profit and loss statements at such times as such statements may be requested by the said District Director.

"3. The Carvers, being the holders of all the shares of stock in the said Corporation, will deposit and they do concurrently, with the execution and delivery of this Agreement, deposit with the District Director, as depository, subject to the provisions hereof, blank endorsed, certificates representing all of their stock ownership in the said Corporation, such deposit being subject to the following conditions:

"As and when it may seem fit to the Escrow Agent, the said Escrow Agent is to have full power and privilege to vote the deposited stock in such manner as to him may seem desirable, in his free discretion, for the better security of the United States; said stock to remain on deposit until all the unpaid Federal tax liability, set out in Exhibit A, together with all the statutory interest thereon, shall be fully met and paid; and thereafter, or at such earlier time as the said District Director shall determine, to be returned to the said Carvers, or as the case may be, to their representatives, successors or assigns.

"4. All monies of the Corporation, except such as have heretofore come in to the possession of the District Director, all monies of the Escrow Agent hereinafter designated received or held by him pursuant to his agency, and all monies hereafter received, collected, or otherwise coming into the possession of the Corporation or to the Escrow Agent, as such, shall be forthwith paid into an appropriately captioned account with a bank or national bank doing business in Muscatine, Iowa, or a town or city contiguous thereto approved by the District Director and having its principal office or a branch office therein.

"5. The ordinary expenses of the business of the Corporation shall be paid promptly when due (or at such other time or times as the Escrow Agent shall deem necessary or proper in order to obtain the advantage or trade or other discounts) out of said account provided, that such payments, and any other withdrawals from said account shall be made only upon the signature of the Escrow Agent, and any one or more of such other persons as may from time to time be designated by the Escrow Agent, provided always that no person so designated shall have any authority to make withdrawals unless and until his designation has been approved in writing by the District Director.

"In like manner remittances are to be made to the District Director for application on the aforementioned assessments in the amounts and on the dates set out below:

| | |
|---|---|
| November 15, 1954 | $5,000.00 |
| December 15, 1954 | 1,000.00 |
| January 15, 1955 | 1,000.00 |
| February 15, 1955 | 1,000.00 |
| March 15, 1955 | 1,000.00 |
| April 15, 1955 | 1,000.00 |
| May 15, 1955 | 1,000.00 |
| June 15, 1955 | 2,000.00 |
| July 15, 1955 | 3,000.00 |
| August 15, 1955 | 3,000.00 |
| September 15, 1955 | 3,000.00 |
| October 15, 1955 | 2,000.00 |

and in addition, within not more than ninety days after the close of its current fiscal period (June 30, 1955), an amount equal to fifty per-

cent of its net profit for said period, in excess of $24,000.00 and not in excess of $74,000.00 plus an amount equal to its entire net profit in excess of $74,000.00. 'Net profit,' for the purposes of the preceding sentence, is defined as the net income of the Corporation, computed for Federal income tax purposes, less the amount of Federal income taxes due and payable thereon.

"On or before September 30, 1955, the Escrow Agent, the Taxpayers and the District Director will determine a supplemental schedule of remittances to be due and payable for the Corporation's fiscal period ending June 30, 1956.

"6. No liability of whatsoever nature, other than those which ordinarily and necessarily are incurred in the usual and ordinary conduct of the business of the Corporation, shall be incurred by the Corporation or the Escrow Agent without the prior written approval of the District Director; provided, further, no liability of whatsoever nature which ordinarily and necessarily is incurred in the usual and ordinary conduct of the business of the Corporation, shall be incurred by the Corporation or the Escrow Agent in excess of $. . . . . . without the prior written approval of the District Director.

"7. No property of the taxpayer, real, personal or mixed, of any nature whatsoever, shall be transferred or in any way encumbered, pledged or hypothecated, except upon the prior approval of the Escrow Agent and the District Director.

"To better secure the payment of the indebtedness, set out in Exhibit A, attached hereto, and statutory interest thereon, the Taxpayers hereby agree to execute and deliver and they do concurrently, with the execution and delivery of this Agreement, deliver to the District Director (1) a mortgage to the United States of America of all of the real property belonging to the Corporation and (2) a mortgage to the United States of America of all of the chattels and other articles of personal property belonging to the Corporation, including all machines, machinery, tools, appliances, furniture, fixtures, hand-trucks and other equipment and similar articles of personal property and the appurtenances thereto now or hereafter used in the operation of the factory of the Corporation, but not including any raw materials, work in process, finished goods, supplies, or any other articles commonly included in or referred to as 'inventory.' The Taxpayers hereby agree to pay all the expenses of recording said mortgages.

"8. It shall be the duty of the Escrow Agent to take all reasonable measures to safeguard, protect and conserve all of the assets of the taxpayer, and the Escrow Agent shall have power to do all acts and things reasonable and proper in the discharge of said duty.

"9. The Escrow Agent shall furnish and maintain in full force and effect, for and during the term of this Agreement, a fidelity bond in an amount and with a corporate surety satisfactory to the District Director. The Taxpayers shall pay all the expenses of procuring and furnishing such bond. The District Director may at any time and from time to time require an increase in the penal sum of such bond or a change in the corporate surety thereon, and the Taxpayers shall pay the expense of any such increase or change.

"10. For and during the term of this agreement the Escrow Agent will receive from the funds pertaining to the business of the Corporation mentioned in paragraph 4 above, the sum of $2,000.00 per month for his services as Escrow Agent and he does hereby expressly waive all right to any other compensation from the Corporation.

"11. For and during the term of this Agreement, Roy J. Carver, shall

be retained and employed by the Escrow Agent, at a salary of $2,-000.00 per month to assist and advise in the business operations and in establishing business policies for the enterprise operated by the said Escrow Agent, and the said Roy J. Carver shall not receive any other compensation for services rendered during the said term to the Escrow Agent or the Corporation and shall be retained and employed only upon the condition that he expressly waive all right to such other compensation. Lucille A. Carver shall not be retained or employed by the Escrow Agent or the Corporation, during the term of this Agreement, except with the written approval of the District Director.

"12. The District Director shall not be responsible individually or officially, for the payment of any of the compensation provided in this Agreement.

"13. The Escrow Agent will pay to the District Director all employment taxes (all taxes levied under the provisions of Subtitle C of the Internal Revenue Code of 1954 [26 U.S.C.A. § 3101 et seq.]) and all other Federal taxes on or before the date on which they become due.

"14. The Escrow Agent shall hold and possess the assets of the taxpayer only in his capacity as such Escrow Agent.

"15. Nothing herein contained is intended to, or shall be deemed to vest any title, legal, equitable or otherwise, in the Escrow Agent in any capacity whatever.

"16. The execution of this Agreement by or on behalf of the District Director does not constitute any relinquishment by him or on his behalf of his authority to distrain upon the assets of the taxpayer, including assets held by the Escrow Agent, during the term of this Agreement or thereafter, for any Federal taxes alleged by him to be due, nor does it constitute any admission or conces-

sion by him or on his behalf of any defect or irregularity in any warrant or warrants of distraint heretofore issued against the taxpayer or in the manner or for of their issue, or that any lesser sum is due in respect of Federal taxes, penalty and interest thereon than as shown on said warrants heretofore issued, nor of any other matter whatsoever to his prejudice or to the prejudice of the United States of America. This Agreement is executed by him or on his behalf solely for the purposes hereinafter set forth in paragraph 17.

"17. This Agreement is made and executed by the District Director and the Taxpayers for the purpose of avoiding the dissipation of assets in which the Government or the Taxpayers or all may have an interest and to permit the continued operation of the business of the Corporation and the safeguarding, conservation and preservation of its assets and the value thereof in order to assure the existence of the business of the Corporation and its assets. The Escrow Agent shall have the right to resign by giving 30 days written notice in advance to the District Director, the Carvers, and the Corporation.

"18. This Agreement shall continue in full force and effect until the earliest to occur of the following:

"(i) The termination of this agreement by mutual consent of the District Director and the Taxpayers, or the superseding of this agreement by a new agreement between the same parties.

"(ii) A seizure by the District Director, under warrant for distraint, for any part of the assets held by the Escrow Agent.

"(iii) The failure or refusal of the Taxpayers to execute, within thirty days after the mailing to them of a written request from the District Director to do so, waivers (for

a period not exceeding one year) of the statute of limitations on collection.

"(iv) The payment in full by the Taxpayers of the Federal tax assessments set out in Exhibit A, hereto attached, together with statutory interest thereon.

"(v) The resignation of the Escrow Agent.

"19. The Escrow Agent shall not be personally liable for any act he may do or omit to do as Escrow Agent hereunder while acting in good faith and with the consent of the District Director.

"20. The Taxpayers hereby expressly waive the benefit of any statute of limitations applicable to the collection of the liability set out in Exhibit A, attached hereto, and agree to the suspension of the running of the statutory period of limitations on collection for the period during which this agreement continues in full force and effect and for one year thereafter.

"21. Wherever the approval of, notification to, or request of, the District Director is required by this agreement, the approval of, notification, or request of, the Supervisory Collection Office at Davenport, Iowa, shall be sufficient for all purposes.

"22. This Agreement and all of its terms and conditions shall inure to the benefit of, and be binding upon, the District Director and his successor or successors in office and the Taxpayers and their successors and assigns.

"In Witness Whereof the parties hereto have hereunto affixed their hands and seals and the corporate party has caused these presents to be executed by its president, attested by its secretary and its corporate seal to be hereunto affixed by order of its board of directors at .............,

Iowa, all the day and year first above written.

"R. E. Tanner
 "Escrow Agent,
"Roy J. Carver
"Lucille A. Carver
"Frank M. Hilpin,
 "District Director
"Carver Pump Company,
 "By Roy J. Carver,
 "President,
"Attest:
"............, Secretary."