329 F.2d 585
 2 UCC Rep.Serv. 110
 BOEING AIRPLANE COMPANY, a Corporation, Appellant,
v.
John A. O'MALLEY and V. J. Pedrizetti, Trustees in
Dissolution of Atlas Helicopter Service, Inc., a
Corporation, Appellees.
John A. O'MALLEY and V. J. Pedrizetti, Trustees in
Dissolution of Atlas Helicopter Service, Inc., a
Corporation, Appellants,
v.
BOEING AIRPLANE COMPANY, a Corporation, Appellee.
 Nos. 17266, 17267.
 United States Court of Appeals Eighth Circuit.
 March 25, 1964.
 
 William P. O'Brien of Nye, Sullivan, McMillan, Hanft & Hastings, Duluth, Minn., made argument for the Boeing Airplane Co. and filed briefs.
 Solly Robins of Robins, Davis & Lyons, Minneapolis, Minn., made argument for John A. O'Malley and others and filed brief with Harding A. Orren and Lawrence Zelle, of counsel, Robins, Davis & Lyons, Minneapolis, Minn., H. B. Fryberger, Duluth, Minn.
 Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.
 VOGEL, Circuit Judge.
 
 
 1
 Case No. 17,266 is an appeal by The Boeing Company from a judgment entered against it based upon a jury verdict returned in a damage suit premised on allegations of fraudulent misrepresentation and breach of contract. Boeing acquired the assets and liabilities of the Vertol Aircraft Corporation in March 1960. The Vertol Corporation, now a division of Boeing, was and is engaged in the design, fabrication and sale of aircraft that have the characteristics of vertical take off and landing (thus the name 'Vertol'). Helicopters are the principal aircraft involved in the work of Vertol. Because all the transactions herein were in the name of the Vertol Aircraft Corporation, The Boeing Company, defendant-appellant, will hereinafter be referred to as 'Vertol'. Atlas Helicopter Service, Inc., will be referred to as 'Atlas'.
 
 
 2
 On August 10, 1961, Atlas brought suit against Boeing in the state district court of Minnesota, alleging damages by reason of fraud on the part of Vertol in the sale of a certain helicopter. The case was removed to federal court on the grounds of diversity of citizenship and amount involved. Thereafter Atlas filed, with consent of court, an amended complaint, again basing its cause of action on the grounds of fraudulent misrepresentations but also claiming breach of warranties, both express and implied. After 25 trial days, the case was submitted to the jury which, on August 17, 1962, returned a verdict in favor of Atlas in the amount of $180,295.23. Two special interrogatories were submitted to the jury as follows:
 
 
 3
 '1. Is your verdict for the plaintiff based on its claim of breach of implied warranty of fitness for the purpose?'
 
 
 4
 To which the jury answered, 'Yes.'
 
 
 5
 '2. Is your verdict for the plaintiff based on its claim of fraud or misrepresentation?'
 
 
 6
 To which the jury answered, 'No.'
 
 
 7
 Appeal No. 17,267 is by Atlas, claiming that error in the court's instructions resulted in the jury's negative answer to the second interrogatory. Such appeal is to be considered only in the event this court should order a new trial in No. 17,266.
 
 
 8
 Atlas was organized in October of 1959 by six individuals from Omaha, Nebraska, and Duluth, Minnesota. The Omaha group consisted of Byron T. Brown, Barton H. Ford, Robert E. Towle, Jr., and Bernhardt Stahmer. The Duluth group consisted of Myles F. Hall and Reinhold Melander. Neither Brown, who had been in the business of operating his own airplane for hire, and who became vice president and general manager of Atlas, nor any of the other organizers had any previous experience or knowledge with reference to the performance or operation of helicopters. This lack of knowledge and experience was known to Vertol.
 
 
 9
 For some time representatives of Vertol had been negotiating with the organizers of Atlas as to the sale to them of a Vertol helicopter which at that time was in Europe and which had been used for flying passengers between Brussels and Paris during the Brussels World Fair. Atlas was interested in acquiring a helicopter to be used in utility work such as the laying of heavy weights in construction. During the negotiations, a representative of Vertol took Hall and Brown on a trip to the oil centers of the South to demonstrate business potentials there for a utility helicopter. Vertol prepared a brochure for Atlas' use in advertising for business which stated and showed that Atlas would have a helicopter that would perform the tasks demonstrated in movies and in pictures such as lifting up to 4,000 pounds of equipment (5,000 pounds under certain conditions), laying of pipelines, transporting up to 19 crew members or two tons of cargo, setting of poles and having a 'useful load' of up to 5,360 pounds.
 
 
 10
 It was the contention of Atlas, supported by their witnesses, that the Vertol representative told them that the helicopter they proposed selling to them, and which was then in Europe, would be able to perform all of the various jobs portrayed, including the carrying of 19 people 75 miles off-shore and return. Having become aware of the fact that the ship in question was equipped with only 14 or 15 seats, one of the Atlas men inquired of Hemberger, 'How do we carry the 19 people?' And he was told, 'Well, you just take these seats out and put in troop seats,' and that such a job took about an hour or two and could be done with a screwdriver. This testimony was disputed by Vertol. Through Hemberger, Vertol claimed that the differences in weight and capabilities were fully discussed with the Atlas representatives; that the latter were told that in order to convert that particular ship to carry 19 people and to lift the weights referred to and perform the tasks illustrated in the movies and pictures and explained orally, certain modifications had to be made, and that such modifications would cost something in the neighborhood of $15,000 to $20,000.
 
 
 11
 On October 6, 1959, Vertol and Atlas entered into a formal written contract whereby Vertol agreed to sell and Atlas agreed to buy the European-based helicopter described as follows:
 
 
 12
 '1. One (1) used Vertol Model 44B airline helicopter (U.S. FAA Registration No. N-74058) as described in Exhibit 'A' annexed hereto. The said helicopter shall be in flyable condition with a currently valid U.S. FAA Airworthiness Certificate.'
 
 
 13
 Atlas agreed to pay Vertol $235,000 for the helicopter, $10,000 of which was payable upon execution of the agreement and the second installment of $225,000 upon delivery of the helicopter to Atlas at Omaha, Nebraska. As to warranties, the contract provided:
 
 
 14
 'ARTICLE 6-- WARRANTY
 
 
 15
 '(a) VERTOL warrants that it is the full legal and beneficial owner of the helicopter described in ARTICLE 1, and that it is not subject to any lien, charge or encumbrance.
 
 
 16
 '(b) The foregoing warranty is given and accepted in lieu of any and all other warranties, expressed or implied, arising out of the sale of the helicopter.'
 
 
 17
 It is the contention of Vertol that it sold the helicopter to Atlas 'as-is, where-is' and that accordingly there were neither express nor implied warranties with reference to its fitness for any purpose. Support for Vertol's contention of an 'as-is' sale, though not part of the contract and not in writing, is its Exhibit C, which is a transcript of certain negotiations between Hemberger, for Vertol, and representatives of Atlas prior to sale. Discussion was had with reference to the use of the helicopter then in Europe, after which the following statements were made:
 
 
 18
 'Hemberger
 
 
 19
 'That's right. After the six month operation was over, the aircraft was turned back to us. One of the two aircraft was sold; the other one was used as our demonstrator in Europe and toured around Europe putting on demonstrations. And, this is the aircraft that went to the Vatican and so forth and the aircraft now has about 1200 hours on the airframe. Of course the major components vary in time because some have been changed since new and so forth. And, what we propose is that we offer the aircraft as-is, where-is for $235,000 to the seller.'
 
 
 20
 'Melander 'That's $235,000.'
 
 
 21
 'Hemberger '$235,000, that is, where-is, as-is, that's how we have offered it. Now when Mr. Brown called me and said that he was interested in talking about this machine, I went to our Board of Directors and asked that certain things be done to the machine and certain compensations be made in order to deliver it; and the price; and for these items not to be included over and above the present price, where-is, as-is condition in Europe; and, I have gotten their approval for Vertol to pay for the crating of the aircraft which is $5,000, shipping of the aircraft back to our plant which is additional $5,000 and approximately $20,000 worth of work on the aircraft to put it into a more decent condition than it's presently in and that would include all of the modifications that would be necessary to certify it for operations in the U.S. and also to overhaul and repair any of the major components that had more than 200 hours, or had less rather than 200 hours remaining before they needed an inspection period. So that they would be * * *'
 
 
 22
 'Hall 'Are there more in that category?'
 
 
 23
 'Hemberger 'That's right. There would be no major components that would require a schedule inspection for overhaul prior to 200 hours and this work came up to about $20,000."
 
 
 24
 It is the contention of Atlas that the 'as-is, where-is' offer did not apply to it; but, rather, the statements that they had offered and 'we have offered it' and Hemberger's statement immediately after his reference to 'as-is, where-is' demonstrated that was not the type of offer which was being made to Atlas. Atlas finds support for its position in that Hemberger clearly stated that the aircraft was to be shipped to the United States and have 'approximately $20,000 worth of work * * * to put it into a more decent condition than it's presently in' and to be modified to the extent necessary to certify it for operation in the United States. The language used by Hemberger was not understood by Atlas to be an exclusion of all warranties. The Atlas people considered the expression 'as-is' meant that the helicopter would have all of the extra fine surplus equipment that Hemberger had described as being of such added value. Brown testified:
 
 
 25
 'Q. And in connection with the presentation made there, Mr. Hemberger indicated this aircraft was for sale in an 'as is' condition? A. Yes. He said as is, but he said the as is is that we're not going to remove any of this extra fine surplus equipment such as floats, the twenty or thirty thousand dollars worth of radio that it has in it. We're going to leave the beautiful airline seats and we're going to leave the flags painted on the side of it, and that is what he meant by as is.
 
 
 26
 'Q. Well anyway, he did say 'as is', didn't he? A. Well, to this extent, that it was also discussed at that time that he knew and we knew that we were not buying a ship in Paris or Brussels, Belgium, that they were bringing it back to the Vertol factory, and they were going to repaint it. So when he said as is-- where is,-- we're not buying a pig in a poke for $235,000.'
 
 
 27
 In any event, the conversations as shown in Exhibit C, supra, were preliminary to the making of a formal contract and were not included therein.
 
 
 28
 Without going into unnecessary detail, the evidence indicates here that Atlas' experience with the helicopter was most discouraging. The aircraft was unable to perform the tasks shown to have been performed by another Vertol helicopter in their movies and photographs and unable to perform tasks which Hemberger had said it could perform. The Vertol helicopter was unable to compete successfully with another model owned by Atlas' competitors. When an attempt was made to get troop seats to replace the 14 or 15 seats in the helicopter, it was learned that an additional cost of $15,000 to $20,000 was involved.
 
 
 29
 Atlas contended that as a result of false and fraudulent representations, known to be false and made with the intent to deceive and defraud, and as the result of breach of express and implied warranties, it suffered a total damage of $410,000. The trial court first determined that as a matter of law there was no express warranty involved. Subsequently the trial court ruled that as a matter of law there was an implied warranty that the helicopter was reasonably fit for the purpose for which it was intended and it left for the jury the determination of whether or not there had been a breach of such implied warranty. The main thrust of Vertol's appeal here is that the court committed error in holding that there was an implied warranty as a matter of law.
 
 
 30
 The contract between the parties provided, and they herein agree, that the applicable law is that of the Commonwealth of Pennsylvania. Of primary consideration is the determination of whether the provisions of the 1954 Uniform Commercial Code of the Laws of Pennsylvania are applicable or if the provisions of the 1959 amendment, which went into effect January 1, 1960, determine the rights of the parties. The Uniform Commercial Code for Pennsylvania, as it went into effect in 1954, 12A P.S.Pa. 1-101 et seq., provided:
 
 
 31
 '2-- 315. Implied Warranty: Fitness for Particular Purpose
 
 
 32
 'Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose. (1953, April 6, P.L. 3, 2-- 315.)' '2-- 316. Exclusion or Modification of Warranties
 
 
 33
 '(1) If the agreement creates an express warranty, words disclaiming it are inoperative.
 
 
 34
 '(2) Exclusion or modification of the implied warranty of merchantability or of fitness for a particular purpose must be in specific language and if the inclusion of such language creates an ambiguity in the contract as a whole it shall be resolved against the seller; except that
 
 
 35
 '(a) all implied warranties are excluded by expressions like 'as is', 'as they stand', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and
 
 
 36
 '(b) when the buyer has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and
 
 
 37
 '(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.
 
 
 38
 '(3) Remedies for breach of warranty can be limited in accordance with the provisions of this Article on liquidation or limitation of damages and on contractual modification of remedy (Sections 2-- 718 and 2-- 719). (1953, April 6, P.L. 3, 2-- 316.)'
 
 
 39
 On October 2, 1959, just three days before the execution of the contract here in question, the 1954 Act was amended by the Pennsylvania Legislature, the amendment to go into effect as of January 1, 1960. The amendment removed the requirement that a disclaimer of implied warranty of fitness had to be stated specifically. As amended, the Act provided as follows:
 
 
 40
 'Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof." (Laws of Pennsylvania, Uniform Commercial Code, 2-- 316, subpar. 2)
 
 
 41
 Repealer and transition provisions with reference to the 1959 amendment provided:
 
 
 42
 'Section 10. Repealer. (1) Except as provided in this section, all acts and parts of acts are repealed in so far as they are inconsistent herewith.'
 
 
 43
 'Section 11. Provisions for Transition. (1) Transactions validly entered into after 12:01 A.M. on July 1, 1954, and before January 1, 1960, and which were subject to the provisions of this Act as it was in effect during such period and which would be subject to this Act as reenacted, amended and revised if they had been entered into after such effective date and the rights, duties and interests flowing from such transactions remain valid after such date and may be terminated, completed, consummated or enforced as required or permitted by this Act as reenacted, amended and revised * * *.' Act 1959, Oct. 2, P.L. 1023.
 
 
 44
 Counsel for appellant find no cases construing Section 11, 'Provisions for Transition', but take the position that the 1959 Act or amendment was applicable to the contract with which we are here concerned even though that contract was executed prior to January 1, 1960, the effective date of the amendment. In lieu of any judicial interpretation by the courts of Pennsylvania, appellant proffers as 'the clearest statement of the meaning of this section' the opinion of William D. Hawkland in SALES AND BULK SALES UNDER U.C.C. printed in March of 1958 for the Committee on Continuing Legal Education of the American Law Institute:
 
 
 45
 'Subsection 2-316(2) permits the disclaimer of implied warranties. But, under this subsection, general disclaimers found in unexpected and unbargained for language are ineffective. To be effective, the disclaimer must be conscionable (2-302)-- that is, it must be in language which tested by reasonable commercial standards, conveys to the buyer an understanding of the risks he is required to assume. This philosophy is implemented by a provision of subsection 2-316(2) to the effect that the implied warranty of merchantability can be disclaimed only by conspicious and specific language or other circumstances which protect the buyer from surprise. The seller is not required to use specific language to disclaim the warranty of fitness for the purpose, but the interests of the buyer are safeguarded by a requirement that the warranty of fitness for the purpose can be disclaimed only by a conspicuous writing.'
 
 
 46
 The quotation relied on is hardly a persuasive answer to the question involved; that is, whether or not the 1959 amendment was applicable to this transaction. The District Court obviously held that the 1959 amendment was not applicable to the contract which was executed October 6, 1959. Substantial support for the District Court's conclusion is found in cases determined by the Pennsylvania courts. See Sterling Acceptance Co. v. Grimes, 1961, 194 Pa.Super. 503, 168 A.2d 600, 601, wherein amendments to the Code of Pennsylvania were, as here, to become effective subsequent to the execution of the contract there in question:
 
 
 47
 '* * * This agreement was filed in compliance with 9-302 of the Uniform Commercial Code of April 6, 1953, P.L. 3, 12A P.S. 9-302.'[1] '1. 'Numerous amendments were made to the Code by the Act of October 2, 1959, P.L. 1023, but these are not relevant to the transaction involved in this case because they became effective subsequent to such transactions.'
 
 
 48
 Paramount Paper Products Co. v. Lynch, 1956, 182 Pa.Super. 504, 128 A.2d 157, 158:
 
 
 49
 'The transaction took place in the latter part of 1953. This was subsequent to the enactment of the Commercial Code, but prior to its effective date of July 1, 1954. This case is therefore governed by the Sales Act of May 19, 1915, P.L. 543.'
 
 
 50
 L. & N. Sales Co. v. Stuski, 1958, 188 Pa.Super. 117, 146 A.2d 154, 157:
 
 
 51
 '* * * This transaction having been consummated subsequent to the enactment of the Uniform Commercial Code is therefore governed thereby. Act of 1953, April 6, P.L. 3, 12A P.S. 1-101 et seq.'
 
 
 52
 We think the District Court's determination that the transaction between the parties was controlled by the 1954 Code and not the 1959 amendment is supported by the foregoing opinions of the Pennsylvania courts.
 
 
 53
 In applying the 1954 Code and disregarding the 1959 amendment, we come to the question of whether or not the District Court reached a proper conclusion when it determined that as a matter of law there was an implied warranty herein. It is pointed out that under 2-315 if (1) the seller has reason to know any particular purpose for which the goods are acquired and (2) that the buyer is relying on the seller's skill or judgment, there is then an implied warranty that the goods shall be fit for such purpose. The evidence is conclusive of the fact that Vertol knew the particular purposes for which the helicopter was to be acquired. Vertol, in fact, suggested usages with which Atlas was not familiar, took Atlas representatives to the Gulf, introducing them to persons who might be interested in engaging their services and told such prospective customers, 'Atlas Helicopter Company has been formed and will have a ship in the Gulf within six weeks to serve the oil industry and do these things that are shown', referring to the movies, pictures, etc. Vertol issued a press release from Morton, Pennsylvania, December 2, 1959, stating:
 
 
 54
 'Atlas Helicopter Service, Inc., Omaha, Nebraska, yesterday took delivery of their first 15 to 19 passenger Vertol 44 transport helicopter. Using the slogan 'Serving the World from the Center of the Nation', Atlas pilots flew the helicopter from here directly to Pittsburgh to take part in the formal opening of the pation's newest hotel, The Pittsburgh Hilton.
 
 
 55
 'B. T. Brown, Vice President and General Manager of Atlas accepted the Vertol 44 and announced that this delivery is the start of a broad commercial utility helicopter service using Vertol tandem transports. Additional helicopters will be purchased as requirements dictate. The company plans to use the helicopter in a wide range of industry services including construction, laying of pipelines, oil exploration, transportation of offshore drilling crews, surveying, firefighting, and charter passenger service.'
 
 
 56
 Vertol additionally prepared a brochure for Atlas' use setting forth the particular purposes of Atlas' operations, Exhibit 5. That Vertol knew the purposes for which the helicopter was purchased by Atlas and did itself stimulate and suggest some of the purposes cannot be doubted or controverted. In fact, Vertol admits here that it knew 'the general purposes of use'.
 
 
 57
 That Atlas was relying on Vertol's skill and judgment is also beyond question. The uncontradicted testimony is that neither Brown nor any of the others connected with Atlas had any previous experience or knowledge relating to the operation or performance of helicopters. This lack of knowledge and experience and unfamiliarity with helicopters on the part of the Atlas representatives and the fact that they were 'uninitiated' was fully known to Vertol and the record on appeal contains no indication to the contrary. Hemberger circulated an interoffice memorandum to his superiors regarding the possible sale of the helicopter to Atlas. Therein he stated: '* * * Mr. Brown does not have previous helicopter experience * * *.' The only conclusion that could be drawn from the testimony is that Vertol knew the purposes for which Atlas was acquiring the helicopter and also knew that Atlas was relying on Vertol's skill and judgment in the transaction.
 
 
 58
 The next step in the conclusion that an implied warranty existed as a matter of law, and in so instructing the jury, was for the District Court to hold that under the 1954 statute there was no modification or exclusion of the implied warranty. The statute provides that the exclusion or modification 'must be in specific language' and if an ambiguity is created, it is to be resolved against the seller. This means that the disclaimer may not be merely by use of the clause disclaiming 'all warranties express or implied', such as seems to have been attempted in the written agreement. An implied warranty under the statute must be disclaimed by the most precise terms; in other words, so clear, definite and specific as to leave no doubt as to the intent of the contracting parties. The disclaimer here fails as a matter of law to comply with the statute and accordingly we find that the District Court was correct in holding the attempted disclaimer inapplicable.
 
 
 59
 It should be pointed out here that even if it could be held that the 1959 amendment to the statute were applicable, it would make no difference in the result in this case because, while the implied warranty could under the 1959 statute be disclaimed by the form of language used in Article VI of the contract, the 'writing must be conspicuous'. Here it is not so. It is merely in the same color and size of other type used for the other provisions and under the statutory definition of 'conspicuous' fails of its purpose.[1] We accordingly must conclude that the District Court was entirely correct in holding as a matter of law that there was an implied warranty that the helicopter was fit for the purpose intended and that there was no effective disclaimer of such implied warranty.
 
 
 60
 Appellant also contends that Atlas' claim for breach of implied warranty is barred as a matter of law by reason of Atlas' failure to comply with the provisions of the Uniform Commercial Code, Laws of Pennsylvania, 2-607, as follows:
 
 
 61
 'Where a tender has been accepted
 
 
 62
 '(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; * * *.'
 
 
 63
 Atlas' amended complaint alleges that as soon as the unfitness of the 'Vertol 44' was ascertained, it notified Vertol and offered to return the helicopter but Vertol refused to accept or to refund. Specifically, it also alleges that by letter of February 6, 1961, it tendered the helicopter to Vertol and demanded the return of its money, which was refused. Appellant's answer denied notification and claimed that Atlas was guilty of laches in asserting its 'pretended causes of actions of fraud and breaches of warranty, and by failure to notify Vertol of any alleged discrepancies with reference to their aircraft and its purchase they would not be entitled to damages'.
 
 
 64
 The evidence indicates that following the purchase and delivery of the helicopter, Atlas began advertising and bidding for business, claiming ability to perform the tasks set forth in the movies shown by Vertol and set out in pictures by Vertol in the brochure it prepared for Atlas' use. Hemberger encouraged Atlas to give demonstrations in the Gulf area, ostensibly for the purpose of stimulating Atlas' utility business. In an interoffice memorandum, however, Hemberger indicated very clearly that his primary purpose in being in the area was to sell Vertol 44 helicopters to the oil companies and not particularly because of the 'mother-child' relationship he suggested existed between Vertol and Atlas. After reporting as to the prospects and the possibility of the sale of several helicopters to oil companies, Hemberger stated:
 
 
 65
 '* * * In the meantime, Atlas Helicopter Service is helping our cause tremendously by offering our equipment on a charter basis.'
 
 
 66
 Atlas found that, contrary to expectations and representations made to it by Vertol, it was having problems in carrying 12 men a distance of only 30 to 35 miles out into the Gulf. They found it necessary to remove two of the 14 seats so as to avoid questioning by oil rig crew members as to why they could not carry a full load of 14 passengers. In the meantime, Atlas' competitor, Petroleum Helicopter, was carrying 12-man oil rig crews 68 to 72 miles out into the Gulf with a Sikorsky S58. Atlas continued to experience difficulty in performing the tasks which Vertol said the helicopter would be able to perform.
 
 
 67
 William Coffee, Vertol's supervisor of service operations, Hemberger and others for Vertol encouraged and tried to assist Atlas in obtaining and then in performing work it contracted to do. One job, to transport a radio hut out to one of the California Company's production platforms, was felt to be so important to Atlas that Atlas asked Vertol to send Mr. Coffee to Louisiana to help on the job and make sure that it was done correctly. The hut weighed 2,940 pounds. Inasmuch as the movies had indicated that a Vertol helicopter could lift 3900 pounds with a half ton to spare, the Atlas people felt there should be no difficulty in moving a hut weighing 2,940 pounds. Mr. Coffee appeared for the job. First, a pilot for Atlas attempted the move, unsuccessfully. Coffee then took over but was not able to perform. On August 12, 1960, after the failure to move the hut, Coffee wrote to Hall as follows:
 
 
 68
 'I am satisfied everything possible was done to prepare for this operation but when it came to the actual flying, there was just simply not enough performance in the helicopter, under the existing conditions of atmosphere and weight, to safely carry the cargo sling loads.
 
 
 69
 'Every practical item was stripped from the helicopter to reduce the basic weight.'
 
 
 70
 Coffee, assuming that Hall of Atlas might be wondering why a Vertol 44 was able to carry a 4100 pound fluid end of a slush pump without apparent difficulty, as shown in the movies, told Hall:
 
 
 71
 '* * * I must admit we had our moments with that piece of equipment to the extent that we relied completely on the wind that was blowing on those days when the combination of temperature and dew point would not have permitted us to fly. * * * Further, we had been working with this particular load for some time and knew all its handling characteristics and margins in performance with which we could fly.'
 
 
 72
 When Owens of Atlas inquired of Coffee why the task could not be performed, Coffee said, 'Well, I just don't know.' Owens inquired, 'What do you mean you don't know?' Coffee replied, 'Well, the ship just won't perform.' Owens inquired why the movie showed that it would perform. Coffee answer, 'Well, you have to take those movies with a grain of salt.' 'We had our problems in making those movies.' Coffee called Hall at LaFayette, reporting the failure to lift the hut. Hall said, 'My God, you don't mean to tell me you can't lift that hut?' Coffee replied, 'No, we couldn't do it.' Hall inquired, 'Good God, Bill, you carry a 4,100 pound slush pump around with weight to spare and you can't carry this hut. How could it possibly be you can't carry that hut?' Coffee answered, 'We depended on the wind when we lifted that slush pump, and there were some other things that you wouldn't understand.'
 
 
 73
 In September 1960 Hall communicated with Hemberger and told him that the helicopter was being taken to Tulsa because Atlas was shutting down operation and had facilities in Tulsa to take care of the helicopter. Hall told Hemberger that conditions were impossible because of all the failures and because the helicopter would not do what it was sold to Atlas to perform. Shortly thereafter Atlas went into liquidation and O'Malley and Pedrizetti were appointed trustees. By November 1, 1960, Atlas had sustained an operating loss of $147,768.89.
 
 
 74
 On February 6, 1961, Atlas, through its then counsel, gave Vertol formal written notice by letter of the helicopter's inability to perform as represented, demanded that Vertol accept the return of the helicopter, refund the purchase price and compensate Atlas for additional damages necessitated by the failure of the helicopter to perform as represented. It would seem perfectly obvious from all of the foregoing that Vertol was completely aware of the difficulties Atlas had in trying to get the helicopter to perform in accordance with Vertol's representations so that it could have been no surprise to Vertol when they received Atlas' letter with the demand dated February 6, 1961.
 
 
 75
 Comment which follows the notice statute, 2-607, supra, is enlightening:
 
 
 76
 'UNIFORM COMMERCIAL CODE COMMENT.'
 
 
 77
 '4. The time of notification is to be determined by applying commercial standards to a merchant buyer. 'A reasonable time' for notification from a retail consumer is to be judged by different standards so that in his case it will be extended, for the rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy.
 
 
 78
 'The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2-- 605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.' Pa.Stat.Ann., Title 12A, 2-- 607, Comment 4.
 
 
 79
 With reference to the attention of Hemberger and Coffee being called to the fact that the helicopter was not performing in accordance with representations, the Pennsylvania statutes provide:
 
 
 80
 'GENERAL DEFINITIONS'
 
 
 81
 '(27) Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence.' Pa.Stat.Ann., Title 12A, 1-201.
 
 
 82
 There is sufficient substantial evidence in the record from which the jury could well conclude that notice to Vertol and Vertol's representatives had been given by Atlas within a reasonable time and it can only be concluded here that the jury so found. In addition thereto, it is pointed out and we recognize that appellant, having taken no exception to the failure of the trial court to charge on the notice issue, having offered no request on the point, and having failed to raise the issue in the court below, may not here for the first time attempt to take advantage of the alleged error. Ward v. Brown, 10 Cir., 1962, 301 F.2d 445, 447; Carter Carburetor Corp. v. Riley, 8 Cir., 1951, 186 F.2d 148, 150; Falstaff Brewing Corp. v. Iowa Fruit & Produce Co., 8 Cir., 1940, 112 F.2d 101, 106; and F. W. Woolworth Co. v. Carriker, 8 Cir., 1939, 107 F.2d 689, 692.
 
 Appellant also contends:
 
 83
 ' In the light of the determination by the jury that Vertol was not guilty of fraud, misrepresentation or failure to disclose, the existence of any implied warranty of fitness for a particular purpose would be dependent on the disclosures that were made and, under the circumstances of this case, no implied warranty of performance capability was made of the Vertol 44-B airliner if it was to be kept in its delivered configuration.'
 
 
 84
 Appellant argues that 'the basic issue was whether or not Vertol had disclosed this limitation and the remedy-- to-wit: modification and/or stripping'. It argues that if the disclosure was made, there could be no fraud and
 
 
 85
 '* * * It is the position of the Appellant Boeing (Vertol) that this basic issue was an 'ultimate fact' and that the determination of the jury that Vertol was not in any way guilty of fraud determined that the disclosures were made.'
 
 
 86
 The argument is without foundation. The interrogatory merely asked, 'Is your verdict for the plaintiff based on its claim of fraud or misrepresentation?', to which the jury answered, 'No.' It did not determine that Vertol did disclose to Atlas the helicopter's limitations and the remedy therefor. Appellant's argument is no more than its saying that because it introduced some evidence to the effect that there was a disclosure of the helicopter's limitations and what the remedy therefor was, that the jury found the disclosure had been made. Whether or not there was a disclosure was a question of fact for determination by the jury. By its verdict the jury apparently found that Vertol did not disclose. There is substantial evidence to support such finding and it is not inconsistent with the jury's answer to interrogatory No. 2, which merely reported that its verdict was not based upon the claim of fraud or misrepresentation. We find no error therein.
 
 Appellant's further contention is:
 
 87
 'The Court erred in failing to instruct the jury on what constituted a breach of implied warranty and in advising the jury that the warranty was not dependent on the agreement of the parties.'
 
 
 88
 Judge Larson instructed the jury as follows:
 
 
 89
 'The main questions of fact to be determined as I see them are, as to the claim of breach of implied warranty:
 
 
 90
 '1. Was the helicopter fit for the purpose for which it was intended?
 
 
 91
 '2. Did the plaintiff in purchasing the helicopter rely on the defendant's skill or judgment?
 
 
 92
 '3. If the plaintiff relied on the defendant's skill or judgment in the purchase of the helicopter, was there a breach of the implied warranty of fitness for the purpose?'4. If there was reliance and if there was a breach, was this the proximate cause of the claimed damage of plaintiff?'
 
 The court also instructed:
 
 93
 'In the sale of such an article as a helicopter there is implied in law a warranty that the helicopter is reasonably fit for the purpose for which it is intended. As stated in the statute which I have just read to you, it must also appear that the buyer relied on the seller's skill or judgment.
 
 
 94
 'While there was such an implied warranty as a matter of law by the defendant, this fact does not in and of itself lead to a right in plaintiffs to recover. It must be established that there was a breach of such implied warranty which proximately caused plaintiffs' damage. You may take into consideration the nature of the product itself, the intended use thereof, and by whom and under what circumstances the defendant might reasonably anticipate the product might be used and operated.
 
 
 95
 'If you should determine that there was not such a breach of implied warranty, that would end your consideration of this part of the case. If you determine that there was such a breach of warranty, you will then determine whether such breach was a proximate cause of plaintiffs' damage.
 
 
 96
 'The warranty that I have been talking about is implied in law and does not depend upon the agreement-- written or oral-- of the parties. I have charged you as a matter of law that there was such an implied warranty here.
 
 
 97
 'I charge you also that the reference to Warranty in Article 6 of the contract of sale of the helicopter is not sufficient as a matter of law to disclaim or exclude the implied warranty of fitness for the purpose, and you will therefore disregard any claim or reference to such disclaimer or exclusion.
 
 
 98
 'You should understand that the claim of fraudulent representation which I will later refer to is not involved in the warranty part of the case.'
 
 
 99
 Appellant's statement that the court erred in failing to instruct the jury on what constituted a breach of implied warranty is obviously incorrect. When this was pointed out in the appellees' brief, the appellant in a reply brief claimed inconsistency in the court's instruction, in that the court charged that the main questions of fact to be determined as to the claim of breach of implied warranty included the question of whether or not the plaintiffs (Atlas) purchased the helicopter in reliance on appellant's skill or judgment, whereas the court determined that as a matter of law there was an implied warranty, which conclusion would obviously include that factor. If this apparent contradiction was error, it could only be classified as harmless and utterly without prejudice to the appellant and therefore not reversible under Rule 61, Federal Rules of Civil Procedure, 28 U.S.C.A. If the jury disregarded the fact that, after giving the complained-of instruction, the court then told them that it had determined as a matter of law that there was an implied warranty and proceeded to determine as a matter of fact that Atlas in purchasing the helicopter did rely on Vertol's skill and judgment, then Vertol comes out the same door wherein it went. In other words, the jury, unnecessarily but actually, did find as a fact something which the court had already determined as a matter of law. Appellant cannot be heard to complain of such a situation, which might well have reacted to its advantage by the jury determining as a matter of fact that there was no such reliance and hence there could be no recovery.
 
 
 100
 It should be pointed out, additionally, that the record does not disclose that the appellant took effective exception to the instruction of which it now complains. Appellant excepted, '* * * on the ground that it is incomplete as to a statement of the law of implied warranty'. The broad, general terms of such an exception are insufficient to direct the trial court's attention to the alleged error and are insufficient to preserve such alleged error on appeal. Rule 51, Federal Rules of Civil Procedure, 28 U.S.C.A., specifically provides that:
 
 
 101
 '* * * No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.'
 
 
 102
 Mr. Justice Whittaker, when a member of this court, said in Apperwhite v. Illinois Central R. Co., 8 Cir., 1957, 239 F.2d 306, 310:
 
 
 103
 '* * * the objection made to the charge, that it was 'not the true law', did not comply with Rule 51 of Fed.Rules Civ.Proc., and, in reality, the point is not properly preserved for our review.'
 
 
 104
 We find no error on this point.
 
 
 105
 We think the above principles of Rule 51 and Apperwhite apply also to appellant's contention that the trial court erred in its instructions to the jury as to the measure of damages for the alleged breach of warranty. Specifically, appellant complains that the court 'instructed the jury without reference to the Uniform Commercial Code of Pennsylvania', and that it improperly stated the following in its instructions:
 
 
 106
 'The particular damages which may have resulted need not have been contemplated or foreseeable by defendant.'
 
 
 107
 In support of its position, appellant cites Keystone Diesel Engine Co. v. Irwin, 411 Pa. 222, 191 A.2d 376. The pertinent provisions on damages for breach of warranty under the Uniform Commercial Code as enacted by Pennsylvania are contained in 2-714 and 2-715, as set out in the margin.[2] The parties disagree as to whether appellant properly objected to the court's charge on this point so as not to be precluded by Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.A., supra, from assigning this issue as error on appeal. Appellant's only objection to the court's instruction on the measure of damages was stated as follows:
 
 
 108
 'The defendant respectfully excepts to the Court's instruction with reference to damages insofar as it applies to implied warranty in view of the plaintiff's; (defendant's?) position that implied warranty is not a part of this case.'
 
 
 109
 Such a general exception is clearly insufficient to meet the requirements of Rule 51. Holliday v. Great Atlantic & Pacific Tea Co., 8 Cir., 1958, 256 F.2d 297, 301; Carver v. Tanner, 8 Cir., 1958, 252 F.2d 26, 31; Apperwhite v. Illinois Central R. Co., supra; Chicago Great Western Ry. Co. v. Casura, 8 Cir., 1956, 234 F.2d 441, 445; Hansen v. St. Joseph Fuel Oil & Mfg. Co., 8 Cir., 1950, 181 F.2d 880, 886. But even if this point were properly before the court, we see no substantial difference between the court's further charge that
 
 
 110
 'The damages recoverable are those which are a natural and proximate result of the claimed breach of warranty or fraud. The particular damages which may have resulted need not have been contemplated or foreseeable by defendant.
 
 
 111
 'The rule as to measure of damages followed is sometimes referred to as the 'out-of-pocket' rule of damages. This is the difference in value of what the plaintiff was induced to part with and the value of what the plaintiff got in the transaction'
 
 
 112
 and the statutory language that 'the measure of damages for breach of warranty is the difference * * * between the value of the goods accepted and the value they would have had if they had been as warranted * * *.' The jury's verdict of $180,295.23 is substantially less than the amount Atlas paid Vertol for the helicopter and there is testimony in the record that the helicopter had no value to Atlas for the purpose for which it was intended at the time of delivery.
 
 
 113
 Appellant also claims that the court erred with reference to the admission of Plaintiffs' Exhibit 116. Plaintiffs' Exhibit 116 was a summary statement prepared by V. J. Pedrizetti, a Certified Public Accountant who was one of the trustees appointed in the dissolution of Atlas Helicopter Service, Inc. The exhibit summarized the contents of voluminous books of account and records pertaining to the financial transactions of Atlas, which records were received in evidence and designated as Exhibits 115, 115A, 115B and 117. Attached to Exhibit 116 was an affidavit of one Scherer which dealt with the obligations under a lease between Transport Leasing Corporation and Atlas. Exhibit 116 was received over objection. At the end of the trial, Atlas moved to amend the complaint to conform to the proof with respect to the damage aspect as outlined in Plaintiffs' Exhibit 116. At that time objection was again made on the ground that Exhibit 116 was based on the hearsay affidavit of Scherer, who did not testify. It was pointed out to the court that all of the matters contained within the affidavit, except the specific amount of attorneys' fees, were covered by the lease between the parties, which lease was offered and received in evidence as Exhibit 117, and that the remainder of the exhibit was merely a reflection of books and records which were in evidence and available to the appellant. The court thereupon struck Scherer's affidavit from the exhibit. We find no error in the receipt of the exhibit.
 
 
 114
 Appellant here also complains of the trial court's refusal to admit into evidence what was designated as Defendant's Exhibit EEEEE. The exhibit was a balance calculation weight accountability list and loading example. It was prepared by D. R. Watson of Vertol's engineering department. The exhibit was for use by Sloan of Vertol in his discussions with Brown of Atlas and was later offered in evidence at the trial to corroborate the testimony of Sloan, who stated that he used the technical information contained in the exhibit during his discussions with Brown but could not 'swear that (he) showed that particular document to Mr. Brown'. Watson was not a witness at the trial. There was no error in refusing to admit the exhibit. Generally, evidence is not admissible to sustain the credibility of an unimpeached witness, and oral or written statements or acts of a witness out of court which support his testimony adduced in court are inadmissible as self-serving and hearsay. See 2 CONRAD, MODERN TRIAL EVIDENCE, 1155 and cases cited therein. Whether testimony which is only corroborative should be received is a matter largely resting within the discretion of the trial court. Harvey v. United States, 2 Cir., 1928, 23 F.2d 561, 566. Even if it could be determined that the refusal to admit the exhibit constitutes error, it would be harmless error within the purview of Rule 61, Federal Rules of Civil Procedure, 28 U.S.C.A., and would be further alleviated by the fact that the contents of the exhibit were substantially testified to by the witness Sloan.
 
 
 115
 We have carefully considered this voluminous record and find no substantial error. Accordingly, case No. 17,266 will be in all things affirmed and case No. 17,267 will be dismissed.
 
 
 
 [1]
 The Act provided:
 'GENERAL DEFINITIONS.'
 '(10) 'Conspicuous': A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color. But in a telegram any stated term is 'conspicuous'. Whether a term or clause is 'conspicuous' or not is for decision by the court.' Pa.Stat.Ann. tit. 12A, 1-201.
 
 
 [2]
 '2-714. Buyer's Damages for Breach In Regard to Accepted Goods
 '(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
 '(3) In a proper case any incidental and consequential damages under the next section may also be recovered.'
 '2-715. Buyer's Incidental and Consequential Damages
 '(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
 '(2) Consequential damages resulting from the seller's breach include
 '(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
 '(b) injury to person or property proximately resulting from any breach of warranty.'